May it please the court, my name is T. Bosolamosi, and I represent the Committee of the Appellant Erie County violated Mr. Lord's First and Fifth Amendment rights of freedom of association and privacy. Well, how do we get around, I mean, I understand that from a, you know, from Mr. Lord's perspective, it doesn't seem fair that a person who got a two day, not two years, not two months, two day sentence, that they're going to apply this particular policy to him. But when you look at, for example, our Rody case, R-O-D-E, mere friendship does not constitute protection. How do we get around that? Well, I think this is a case, and I think this is one of the mistakes that the lower court made. Mr. Bosolamosi, can you speak into that microphone? Oh, sure. Maybe it's – Actually, the microphone – I don't think it works. It's going directly in front of you. Okay. Your Honor, I think that is one of the mistakes that the lower court made in this case, in that he gave no credit to Mr. Lord for having cohabitated with T.O. Underhill. He basically said that the facts of the case were that they were simply friends. And I would submit to you that that is not what the facts of the case show. He lived with him for a significant time. But he was a past roommate. He was a past roommate. So what happened was – I mean, the facts of this case were, right or wrong, they had said, look, there is no fraternization policy, and we understand that you've been seen with Mr. Underhill. Don't do it. And he did it again, so he violated the warning, and he's an at-will employee. And it seems – and friendship isn't protected, so it seems pretty tough to – even though it seems Mickey Mouse, one could argue, it seems pretty tough to say, hey, he has a constitutional right. Well, I understand that, and that's probably why I'm here, Your Honor. However, I believe that he deserves credit for having cohabitated with Mr. Underhill. I don't think that there are any cases that distinguish between what was happening at the time of the termination or the deprivation of the rights, what the status was at that time. At that time, he may have been told that, but he just didn't agree that the policy applied to him. For one thing, the policy stated that he's not allowed to develop a relationship with an inmate. No, he's not supposed to fraternize with an inmate. And this person did get a two-day sentence, and he was told, don't do it. Now, he may be – he could have argued back, et cetera, but he ignored that warning. And how do I get around that? I think if you read the policy, it only prohibits him from developing a relationship with an inmate. That may well be true. But the question here is, you filed a federal civil – well, you filed a state action alleging a violation of federal civil rights. But the question I think Judge Amber is trying to get to in my question is, where's the violation? You could say cohabitate, call him a roommate, call him whatever, but I don't see our line of cases saying that that kind of relationship equates into a protected relationship. That's constitutionally protected. And, in fact, you have a case directly on point that friendship does not touch people. Well, like I said, I think this is friendship combined with cohabitation. And I think the cases do say that if it's cohabitation or a sexually intimate relationship, that there is protection. The record does not support what you're saying. The record at most supports that they were roommates prior to his 48 hours in the Erie County prison. That's it. They saw each other in the bars afterwards. That's what he was cited for by the Erie County authorities. He was fraternizing with a former inmate in violation of our policy. Don't do it, and you do it again. Now the question is, how does that get to the level of the Constitution? Well, that's my only argument. With all due respect, Your Honor, is that there was cohabitation. He actually was living with him at the time he was incarcerated. He took him to the prison, had a conversation with the prison warden about that. Is that accurate? Pardon me? Yeah, I believe that's accurate. New Year's Eve, that's correct. Oh, no. He was living with him at the time he was arrested. I believe that he was living with him at the time. And I may be wrong on this. I believe that he – maybe he wasn't living with him, but he did inform the prison warden about the fact that he either was or had been a roommate of his and even got permission to bring him in. And maybe that's why I'm – I might be mixing the facts up on that. I may have assumed that because he drove him in that he was residing with him. But that's this appellant's really only argument, is that the cohabitation distinguishes this case. Was there a grievance filed in this case as a result of the termination? He was not a – he was a non-bargaining employee. But, however, on the other issues in the case, we do feel that his due process rights were violated because the county had a number of different writings that we believe gave Mr. Lord a property interest. That's in the handbook. Well, more than just the handbook. There was a Department of Corrections disciplinary procedure, and there was an Erie County government employee handbook with a personnel quote that set forth what was supposed to happen before an employee is terminated. They were supposed to receive a written notice two days prior to the termination and that if you didn't agree with it, you had the right to appeal that. That never happened. They simply called him into the office, challenged him on whether or not he had been seen and having a continued relationship with Mr. Underhill, which he admitted to, and he was simply fired at that meeting. Well, he was an Atwell employee, though, that had, we believe, had a property interest by virtue of the various writings, all of which were also adopted in the Erie County Home Rule Charter. But the employee handbook said, well, it's important for you to understand that this handbook in total or in part does not constitute a contract for the county to use. Employers always say that. That would be equivalent to a contract of adhesion, Your Honor. No, it's not. I mean, no, the point is that this is what we go about. You're still an Atwell employee. I mean, if you were advising Erie County when they're drafting that, you would make sure they put that in as well. We all would. If I was, I would agree with that. However, I think there are cases out there that recognize that a defendant that puts these kinds of words into the writing of practices should not be able to disavow themselves of their own written words. Even if there were implied contracts, the contract is that Erie would use progressive steps of discipline. And the first step here is a warning. That's correct. And he ignored or disobeyed the implication of the warning, and only thereafter did he, what was he, terminate it. And in that context, it's awfully hard to make out a constitutional violation. That's pretty big. The fact that he's friends with somebody beforehand. Basically, what they're saying is stay away from him for a year. And he refused to do it, even though they weren't living together anymore. If they were still living together, you would have at least a little more of a case. But they weren't even living together. They were meeting at bars and other places. But the policy says that he's prohibited from developing a relationship. Your Honor, he already had the relationship. So the policy really doesn't even apply to him, and that was his position. I would just ask the Court to recognize and consider that his prior cohabitation and development of a relationship prior to his incarceration distinguishes his case. And I think it deserves an opportunity to proceed in court. And it certainly raises issues of fact concerning what the Court looks at when it looks at the degree of the relationship. It's not a clear-cut test there. There's a spectrum that goes from very intimate to the most attenuated of relationships. And I would submit to the Court that Mr. Ward's case is somewhere in between in that spectrum and that a jury should be the one to decide whether or not Mr. Ward had as well as I did. Thank you. Jerry? Good morning. If it pleases the Court, my name is Patrick Carey. I represent the Appalachee County of Erie. Just a quirky thing to say to you. This appears to be, to the kindest way possible, a hyper-technical violation of a federal statute. You live with this person. You've known this person for a long time. The person got a two-day sentence. Why was the action taken here in this case? I mean, isn't this one of those cases you just sort of wait to go on? I don't think so. I mean, it's a two-day to 21-month sentence. But he served two days. I'm sorry? He served two days, right? He served two days for a simple assault and for disorderly conduct. Now, this is an assault crime he was convicted of. Mr. Ward was not only a correctional officer, he was a rank. He was a lieutenant. He was the training officer for other officers at this prison and other officers that go to other prisons. They have a training academy up there. He's in charge of training. He knows what this policy is. Whether you're in for two days, whether you're in for a week, whether you're in for a month, I mean, I don't view this as a slap on the wrist. He also had the 21-month parole added on or that followed the incarceration. Now, before Mr. Ward took his friend T.O. Underhill to prison, he went and talked to the warden and said, You know, my friend T.O. got in trouble. Yeah, I'm aware of that. And he's going to be sent to jail. I'm aware of that. Would you have an objection if I drove him to jail? I'll let you do that. And I want you to drop him off right in front of the prison, drop him off across the street, and then that's it. No more contact, no more relationship with this guy while he's in jail or for the year afterwards. What if T.O. was his brother? Well, that's different. And the jail makes exceptions for people that come into their facility who are related by blood or marriage to the correctional officers. They make exceptions, but that's not the case here. In fact, I think you hit it on the head, Judge. These two were nothing more than friends. The fact that they lived together for some period of time before Mr. Underhill went to jail I don't think makes any difference. They certainly weren't living together at the time that he went to jail. The record shows that they met in, I think, the spring of 2000 or they met in 2005. They lived together from approximately November until the following spring, the spring of 2006. He gets arrested in January of 2006, goes to trial mid-2006, and then reports to prison at the end of 2006. So they certainly weren't living together when he reported. I don't think that this is a mere technical violation of this standard. And, you know, other people at the prison. What did they catch him doing afterwards? Somebody saw him in a bar, is that right? That's right. That's right. They saw him in a bar, and they saw him leave together in Mr. Lord's vehicle. And so the officer reported that to the warden. The warden brought in Mr. Lord and confronted him. Mr. Lord admitted it, and he was very indignant. Oh, yeah, I did it. But he said at that point, I think that policy applies. Well, I don't know how he could have interpreted it that way. Now, granted, the policy says you shall not develop. That's how he interpreted it. But that was not an issue that was argued before the lower court, that it didn't apply. That's what Mr. Lord said. That was his view. But I question Mr. Lord and his deposition. You're aware of other inmates who were disciplined or fired because they fraternized with somebody who was either in jail or on parole. And they knew them ahead of time. Yes, I'm aware of that. Well, I don't know how Mr. Lord said, well, I didn't develop my relationship with him during his incarceration or afterwards. I developed it before incarceration. Therefore, it doesn't apply to me. That's a very distorted answer. Well, I mean, I don't know how distorted it is. I mean, as the counsel said, the anti-fraternization provision really follows. That employees shall not develop a personal relationship with inmates during or at least one year after the inmate's incarceration. This friendship was already developed before the incarceration. He was going to see somebody who was dead for a drink at a bar. That's true. But the issue of whether the policy as written was overly vague or written improperly was not raised in the lower court and wasn't argued. That was Mr. Lord's interpretation of why he believed this policy did not apply to him. But something that's glossed over in this case, he was terminated for fraternization. But he was also terminated for insubordination, for conduct unbecoming an officer, and for failing to follow order. And there's a letter that's attached as an exhibit that was given to him when he was terminated that listed all four of those reasons, all four of those policies. And, in fact, Judge, you asked, well, why wasn't he given a suspension or why, you know, they terminated him right away. Insubordination is the number one policy in the Department of Correction's standard of conduct. That is listed number one. And it says if you are insubordinate, that is grounds for termination right here, right now. No warning. He was entitled to an appeal under the county's procedures, and he didn't follow it. He took no steps except filing this lawsuit. Before the termination? No. No, I think because he was an officer and he was not subject to the collective bargaining agreement, he wasn't entitled to a grievance. But he was entitled after discipline, whether it's termination or whatever, to file an appeal, to seek redress, to seek a review, and he didn't do it. So to claim that he was violated, his due process rights were violated by the county is ridiculous. That's our position now. Yes, yes. Yes, absolutely clear. There was no – I don't believe so. I mean if you look at the handbook, I think it's the second paragraph that really states this does not – this handbook does not give you any contractual rights or anything else to your employment. You're an at-will employee. And that's the law in Pennsylvania. He's an at-will employee. So his claims that he had a contract or his due process rights were violated are clearly erroneous. Now, Mr. Salamosi says that on the constitutional claim that the developing area, that there's a factual issue as to whether or not this relationship with Tia was protected. And that factual issue should not have been decided unless there was some judgment that he wanted to do. What factual issue could that be on? As to whether or not it was a protected relationship that he just argued. I think that's a legal issue. You would argue that's a legal issue. Absolutely. I mean we know what the nature and extent of his relationship was, and that is they were merely friends. And the court has already ruled over and over that that is not a protected relationship, mere friendship. In fact, if you look at Rode or Rode, I'm not sure you pronounce it. Rode. If you look at that case, the person was not only a friend with the other officer, Rode, it was her brother-in-law. Her brother-in-law. They both worked for the state police. Correct. So you took it one step further. They were related by marriage. They weren't married, but that was her brother-in-law and close friend. And the court said even if you talk about a close friendship, that's not the type of relationship that constitutes constitutional protection or that warrants constitutional protection. So there's no factual issue here. In fact, he's never even argued that there's a material issue of fact that would have prevented something. Except there was a material fact that's not. That's the first time. There was never even an argument raised that there was any material issues of fact. There are some issues of fact, perhaps, but they aren't material. But didn't the magistrate judge in the important recommendation on the motion to assembly judgment conclude that this should go to review? Well, she concluded there weren't enough facts developed as to the nature of their relationship. And I pulled my hair out and said, the facts are there. There's not a lot of them. And they are very simple. At least there was somebody. Well, yeah, and with all due respect to her, I believe she was in error. But the facts are what they are. They had an acquaintance, a friendship, and that's not enough. I think, too, looking back at it, that everybody overanalyzed this case. And Judge McLaughlin, when he issued his opinion, he cited the district court cases which said, I don't know how we did this, how we overlooked the Rody decision, but mere friendship isn't enough. I think we overanalyzed it in a low court. I don't know if you have any questions, but I think the court sees the issues are pretty clear. Thank you very much. Thank you. I don't know that I agree with the proposition that Mr. Lord had the opportunity to file a grievance. The procedure states that you're entitled to a written warning about the termination two days, at least two days prior to it. That never happened. And I believe that he believed that if they weren't following the procedure, that they took the position that they didn't have to follow that procedure with him. And he felt that a grievance would be a waste of time or that they'd take the position that he wasn't entitled to it. And here we have the appellee arguing that, well, yeah, he's entitled to a grievance, but he really has no contract or implied contract. Well, if he's entitled, which way is it? Is he entitled to have a grievance procedure or not? If he's an at-will employee, he certainly wouldn't be. I think he said he was entitled to file an appeal. To file an appeal. Maybe I misused the term. But he didn't do so. No, he didn't do so. But regardless, if he had the right to file an appeal, well, then he wasn't an at-will employee. He wasn't. Because an at-will employee doesn't have rights to file an appeal. And this is the kind of stuff, all combined with the three different documents that we've cited, that gives someone like Mr. Lord some expectation that he does have some rights in his position. They lay it out. You know, when you can be fired, when you can be terminated. And the reason for his termination was not in subordination. The reason was that he violated the policy. He never believed that he did. But I just ask you to take that into consideration. I don't know how they can argue that he had a right to an appeal as an at-will employee. Clearly, an at-will employee wouldn't have that. Thank you. Great. Thank you very much. The case is very well argued. We're excited to take the matter into the public. Thank you.